# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**THOMAS OLSON**
        **Plaintiff,**

    **v.**                              **Case No. 13-C-0015**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
              **Defendant.**

---

## DECISION AND ORDER

In February of 2005, plaintiff Thomas Olson applied for social security disability benefits, claiming that he could not work due to borderline intellectual functioning and affective/personality disorders. On November 4, 2009, an Administrative Law Judge ("ALJ") awarded a "closed period" of disability from February 23, 2007 through October 15, 2009, finding plaintiff disabled between those dates but terminating benefits after plaintiff returned to work on October 16, 2009. (Tr. at 83-88.) In April of 2010, plaintiff re-applied for benefits, again based on his mental impairments, alleging a disability onset date of January 1, 2010.[1] (Tr. at 157, 204.) This time, the (same) ALJ denied the claim outright (Tr. at 25-36), and the Appeals Council declined review (Tr. at 1), making the ALJ's ruling the final decision of the Commissioner of Social Security on plaintiff's 2010 application. See Pepper v. Colvin, 712 F.3d 351, 361 (7th Cir. 2013). Plaintiff now seeks judicial review of the ALJ's decision on that application.

---

[1]The record indicates that defendant's disability insurance benefits ended on December 31, 2009, making January 1, 2010, the earliest date on which he could claim renewed benefits. (Tr. at 204.)

# I. APPLICABLE LEGAL STANDARDS

## A.    Disability Standard

In determining whether a claimant is disabled, the ALJ follows a five-step process, asking:  (1) whether the claimant is currently engaged in substantial gainful activity ("SGA");[2] (2) if not, whether the claimant has a severe impairment;[3] (3) if so, whether the claimant's impairment is one that the Commissioner considers conclusively disabling;[4] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past relevant work;[5] and (5) if not, whether he is capable of performing any work in the national economy. See, e.g., Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012).  The claimant bears the burden of proof in each of the first four steps, but if he reaches step five the burden shifts to the

---

[2]"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, for pay or profit.  20 C.F.R. § 404.1572.  The regulations set forth earnings levels ordinarily indicative of SGA.  See 20 C.F.R. § 404.1574(b)(2).

[3]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii)(c).

[4]These conclusively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings").  To meet or equal a Listing, the claimant must satisfy all of its "criteria."  For instance, in order to meet the mental impairment Listing for Affective Disorders (12.04), the claimant must demonstrate the necessary degree of limitation under the "paragraph B criteria": (1) activities of daily living ("ADL's"); (2) social functioning; (3) concentration, persistence, and pace ("CPP"); and (4) episodes of decompensation.  The ALJ evaluates the degree of limitation in the first three areas on a five-point scale: none, mild, moderate, marked, and extreme, and the degree of limitation in the fourth area (episodes of decompensation) on a four-point scale: none, one or two, three, and four or more. 20 C.F.R. § 404.1520a(c).  In order to be considered disabled, the claimant must have at least two of the following: (1) marked restriction of ADL's; (2) marked difficulties in maintaining social functioning; (3) marked deficiencies of CPP; or (4) repeated episodes of decompensation, each of extended duration.  Larson v. Astrue, 615 F.3d 744, 748 (7th Cir. 2010).

[5]RFC is the most an individual can do, despite his impairments, on a regular and continuing basis, i.e., eight hours a day for five days a week, or an equivalent work schedule. SSR 96-8p.

2

government to produce evidence that the claimant can perform other jobs that exist in a significant quantity in the economy. Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011). Frequently, the ALJ will summon a vocational expert ("VE") to provide an assessment of the types of occupations in which claimants can work and the availability of positions in such occupations. Id.

## B.    Judicial Review

The court does not re-determine disability but rather reviews the ALJ's decision to ensure that he applied the correct legal standards and supported the decision with "substantial evidence." Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Pepper, 712 F.3d at 361-62. Although the court may not under this deferential standard re-weigh the evidence or substitute its judgment for the ALJ's, it must nonetheless conduct a critical review of the record, ensuring that the ALJ adequately discussed the issues and built an accurate and logical bridge from the evidence to his conclusion. McKinzey v. Astrue, 641 F.3d 884, 889 (7th Cir. 2011). A decision denying benefits need not discuss every piece of evidence in the record, but when an ALJ fails to support his conclusions adequately, remand is appropriate. Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011). The court will also remand if the ALJ violated the applicable regulations and case-law for determining work capacity. See, e.g., O'Connor-Spinner v. Astrue, 627 F.3d 614, 618-19 (7th Cir. 2010).

## II.  FACTS AND BACKGROUND

## A.    Plaintiff's 2010 Application and Supporting Materials

As indicated, plaintiff received a closed period of benefits from 2007 to 2009 based on

3

his mental impairments.  Plaintiff re-applied for benefits in April 2010, and in a May 2010 disability report he alleged that manic depressive disorder interfered with his ability to work. (Tr. at 209.)  He reported current employment as a bindery worker (about twenty hours per week), a job he held since June 2008,[6] with past work as a labeler from June 2000 to August 2000, an assembler of basketball hoop bases from October 2001 to March 2002, a manufacturing laborer from 2003 to July 2005, and a machine operator assistant from August 2005 to February 2006.  (Tr. at 211.)  He reported taking Lithium and Zyprexa for his manic depression, and receiving treatment through Walworth County Health and Human Services since 2004.  (Tr. at 213.)

    In June 2010, plaintiff's mother completed a function report, indicating that plaintiff lived alone in an apartment.[7]  She indicated that on a typical day he got up, fed his cat, made coffee, watched TV, and played video games.  (Tr. at 216.)  He was able to care for the cat by himself. Plaintiff's mother characterized him as very restless, hyper, and impatient.  In the area of personal care, she wrote that he needed to shave more often, liked to eat lots of sweets, and

_____

[6]In his 2009 decision, the ALJ found that plaintiff returned to full-time work on October 16, 2009, with no significant medical restrictions.  (Tr. at 85, 88.)  The basis for this finding is unclear, although the decision also indicates that plaintiff's lawyer requested a closed period from February 23, 2007 through October 14, 2009.  (Tr. at 83.)  In the instant decision, the ALJ found that plaintiff had not worked at SGA-levels since January 1, 2010.  The wage information in the record suggests that plaintiff's earnings did not reach SGA-levels in 2009 or 2010.  (Tr. at 177.)  See Kwiatkowski v. Astrue, No. 10 C 6322, 2012 WL 1378653, at *4 (N.D. Ill. Apr. 20, 2012) (discussing 2009 SGA thresholds).  In his brief in this court, plaintiff indicates that the ALJ "was under the impression that Olson had successfully returned to full time work on October 16, 2009." (Pl.'s Br. [R. 11] at 2.)  In any event, the propriety of the ALJ's finding that plaintiff returned to full-time work in October 2009 is not before me; only the ALJ's decision on the 2010 application is subject to review.

[7]In a previous third party function report from November 2009, plaintiff's mother indicated that he lived with her.  (Tr. at 185-92.)

had constipation. (Tr. at 217.) He did not need reminders to take medication. He was able to fix simple meals like peanut butter and jelly sandwiches, cereal, and pizza, but sometimes ate supper with her. He used the vacuum but sometimes forgot to clean the kitchen counters; he did his own laundry but sometimes brought it to her house. (Tr. at 218.) He was able to drive a car but sometimes drove too fast. He shopped for food but usually asked her to go with him. He was able to handle money but always wanted to spend too much. (Tr. at 219.) His hobbies included watching TV and playing video games. He talked to and played video games with friends occasionally but engaged in little social activity. (Tr. at 220.) Plaintiff's mother indicated that he could be very hard to get along with, argumentative with a bad temper. His mental impairment made it hard for him to focus and complete things. He needed to have things explained to him and could pay attention for just a short period. He did not follow written instructions well and would need help. (Tr. at 221.) He did not like changes in routine either and wanted his mother to accompany him shopping; "sometimes he thinks we are staring at him." (Tr. at 222.) She concluded:

> Tom has an apartment he is in now, but he still has problems with his money spending. I have to tell him to not spend money carelessly. He relies on me to help him with things that come up. I feel that Tom needs to be on disability as he has never been able to be self supporting, and I don't see that getting any better in the future. One day he will not have me and this would help him so much.

(Tr. at 223.)

Also in June 2010, plaintiff's employer completed a report for the Disability Determination Bureau, indicating that plaintiff had been employed as a bindery/inserter since June 2008, working an average of eighteen hours per week. His attendance was acceptable, with occasional absences. The employer rated his job performance as satisfactory in terms

5

of volume, quantity, and overall performance. He got along well and was respectful with supervisors and co-workers. He worked limited hours per his request. (Tr. at 224.)

In August 2010, plaintiff completed another disability report, indicating that his impairment caused racing thoughts and made it hard for him to concentrate and maintain work at the same activity. (Tr. at 229.) He continued to work part-time at the bindery. (Tr. at 230.)

In a third report completed in November 2010, plaintiff indicated that his mental condition remained the same. (Tr. at 234-35.) He continued to receive treatment through Walworth County from Dr. Elaine Sorem, who prescribed Lithium, Trazodone, and Zyprexa. He also complained of back pain with lifting. (Tr. at 236.) He continued to work in the bindery about twenty hours per week but complained of difficulty concentrating and paying attention, and of frustration with co-workers. (Tr. at 237.)

## B.    Medical Evidence

Although this case pertains to plaintiff's 2010 application, the record also contains medical evidence related to his previous claim, the pertinent portions of which I summarize below.

In July of 2003, when he was twenty-two years old, plaintiff underwent a psychological evaluation with Marcy Halvorson, Ph.D. for the Social Security Disability Determination Bureau. (Tr. at 296.) On testing, he measured in the borderline range of intellectual functioning, with a full scale IQ score of 73. (Tr. at 298.) Dr. Halvorson diagnosed bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), alcohol and substance abuse (in early remission), borderline intellectual functioning ("BIF"), and rule out anti-social personality disorder, with a

6

GAF of 45.[8]  She noted a fair to poor prognosis.  (Tr. at 299.)  Based on her evaluation, Dr. Halvorson found that plaintiff would be able to understand, remember, and carry out simple instructions, but he would have difficulty responding to supervisors and co-workers even at the superficial level.  He would also have difficulty maintaining attention and concentration, which might interfere with his work pace.  (Tr. at 300.)

On January 11, 2008, when he was twenty-six, plaintiff underwent another consultative psychological evaluation, this time with Thomas Fugette, Ph.D.  (Tr. at 324.)  On testing, plaintiff again measured in the borderline level of intellectual functioning, with a full scale IQ of 75.  (Tr. at 325.)  Dr. Fugette opined that plaintiff's ability to obtain and maintain gainful employment was severely limited because of symptoms secondary to bipolar disorder, including frequent mood swings, inability to sustain focus/attention, and difficulty staying on task.  (Tr. at 329.)[9]

On February 24, 2009, plaintiff saw Steven Singer, M.D., at the Walworth County Department of Health and Human Services, apparently in follow-up to a previous visit on December 30, 2008.  (Tr. at 262.)  Dr. Singer listed diagnoses of bipolar disorder with psychotic features; alcohol abuse in remission; question of ADHD; long incarceration history; grief related

_____

[8]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and his overall level of functioning.  Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others.  Scores of 81-90 reflect "minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms, 31-40 some impairment in reality testing, 21-30 behavior considerably influenced by delusions or hallucinations, and 11-20 some danger of hurting self or others.  Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

[9]In his 2009 decision, the ALJ relied on the opinions of Drs. Halvorson and Fugette as to plaintiff's intellectual functioning.  (Tr. at 87.)

to his father's death in September 2008; and partner relational conflicts. Plaintiff indicated that he was "feeling good" and about to discharge from probation. However, he did report ongoing struggles with his ex-girlfriend, with whom he continued to have some sort of relationship. On mental status exam, plaintiff was fairly dressed and groomed, "interacting with his characteristic intensity, but more mature overall than in previous visits." (Tr. at 262.) He denied suicidal/homicidal thinking, his thought processes were capable of coherence, no hallucinations were noted, and he denied substance abuse. Dr. Singer continued plaintiff on Lamictal[10] and Lithium.[11] (Tr. at 262.)

On July 10, 2009, plaintiff began seeing Dr. Sorem at the Walworth County Department of Health and Human Services. He seemed somewhat nervous when he first came in but later relaxed and opened up. He reported frustration with his bipolar disorder, wishing he did not have to take medication. He also reported frequent arguments with his mother and sister, blowing up at them due to his bipolar. Dr. Sorem indicated that he demonstrated good hygiene and interacted in a normal manner. His thought process was normal, with no hallucinations or suicidal/homicidal ideation. Plaintiff reported that his mood was less stable than it should be, so Dr. Sorem increased his Lamictal dose with Lithium to stay the same. Plaintiff was to return in six weeks to monitor his medications and adjust the dosage as needed. Dr. Sorem noted

---

[10]Lamictal is used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar I disorder, i.e., manic-depressive disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html.

[11]Lithium is used to treat and prevent episodes of mania in people with bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html.

8

that despite the stabilization of medication, Axis II[12] issues would continue to interfere with plaintiff's stability.  (Tr. at 261, 348.)

On October 15, 2009, Dr. Sorem completed a mental impairment questionnaire, indicating that she had treated plaintiff since July 10, 2009 for bipolar disorder with psychotic features; history of ADHD; and history of alcohol abuse now in remission.  She rated his current GAF at 50, highest in the past year also 50.  (Tr. at 248.)  She checked symptoms of poor memory, sleep disturbance, mood disturbance, emotional lability, delusions or hallucinations, anhedonia, oddities of thought, social withdrawal or isolation, feelings of guilt/worthlessness, and difficulty thinking or concentrating.  (Tr. at 248-49.)  She indicated that plaintiff was prescribed Lithium and Lamictal, and his prognosis was fair.  She denied that plaintiff had a low IQ or reduced intellectual functioning, but circled "yes" in response to the question of whether plaintiff would have difficulty "working at a regular job on a sustained basis."  (Tr. at 249.)  Dr. Sorem found slight restriction of ADL's, moderate difficulty in social functioning, moderate deficiency in CPP, and one episode of decompensation of extended duration.  (Tr. at 249-50.)  In an alcohol/drug questionnaire completed on the same date, Dr. Sorem indicated that plaintiff's limitations were not caused or exacerbated by alcohol/drug use, and if he stopped using drugs and alcohol his remaining limitations would still be disabling.  (Tr. at 251.)

Plaintiff returned to Dr. Sorem on October 23, 2009, for a medication check, indicating that he wanted to cut back on his Lamictal dose due to weight gain.  Dr. Sorem indicated that weight gain was not a common side effect, but plaintiff was adamant.  Plaintiff also complained

---

[12]Axis II is part of the DSM's "multi-axial" system for assessment of mental disorders. Axis II covers personality disorders and intellectual disabilities, while Axis I covers clinical disorders such as depression.  http://www.psyweb.com/.

9

that his job was keeping him up too late at night, and he was not getting enough sleep. On mental status exam, plaintiff was somewhat irritable, affect constricted. He denied any suicidal/homicidal ideation, no hallucinations were present, and he otherwise stated that he felt fine. Dr. Sorem agreed to make the requested medication change, cutting back on Lamictal, but with the awareness that his irritability may reflect a possible mood swing. (Tr. at 259, 347.)

On November 10, 2009, plaintiff saw Steven Ortell, M.D., through Walworth County, complaining of headaches and not tolerating Lamictal very well. He indicated that he had been working late and not keeping his sleep cycle under control. On exam, he seemed distressed, somewhat anxious, but with no overt psychosis. Dr. Ortell discontinued Lamictal, added Zyprexa,[13] and continued Lithium. Plaintiff was scheduled to see Dr. Sorem in a month. (Tr. at 260.)

Plaintiff returned on December 2, 2009, with Dr. Sorem finding him more focused than their last appointment, interacting more appropriately. Mental status exam revealed plaintiff to be alert, oriented times three, pleasant, and cooperative, with appropriate affect and good mood. No thought process or thought content disorders were noted. Plaintiff appeared quite stable on his medication. He did complain of feeling sleepy during the day, but Dr. Sorem encouraged him to continue with the medication, hoping he would adjust. Dr. Sorem also encouraged plaintiff to exercise to keep his weight down while on Zyprexa. (Tr. at 258.)

Plaintiff next saw Dr. Sorem on February 19, 2010, doing quite well with his medications. Plaintiff indicated that things had been stable but felt that he needed more exercise. He felt that he was becoming more stable psychiatrically and hoped that when he felt totally stable he

---

[13]Zyprexa is used to treat the symptoms of psychotic conditions such as schizophrenia and bipolar disorder. http://www.drugs.com/zyprexa.html,

could start dating.  He also reported a new hobby of coin collecting.  Mental status exam revealed plaintiff to be alert, oriented times three, cooperative, and pleasant.  No thought content or thought process disorders were noted.  Intelligence was in the average range, and insight was good.  Dr. Sorem continued Zyprexa and Lithium.  (Tr. at 257.)

On April 24, 2010, plaintiff returned to Dr. Sorem, frustrated because his social security benefits had been cut off.  On exam, his affect was bright and mood neutral.  No thought process or thought content disorders were noted, and cognitive function was grossly intact.  Insight was fair and judgment good.  Dr. Sorem continued medications.  (Tr. at 256, 343.)

On June 11, 2010, Dr. Sorem noted that plaintiff seemed to be doing quite well.  He appeared to be making good eye contact, "pleasant, cooperative as usual."  (Tr. at 255.)  He did state that he was having some hypomanic episodes in which he could not sleep.  He was not sure the Zyprexa was helping, so Dr. Sorem increased the dose.  He seemed positive about his work, stating he was not getting as much as he would like to but tolerated it well.  Objectively, he was casually dressed with good hygiene and grooming.  His speech was normal in rate/tone.  Eye contact and mood were good, and affect consistent with mood.  Dr. Sorem noted no hallucinations, delusions, or other thought process/content disorders.  She cautiously increased his Zyprexa dose.  (Tr. at 255.)

On July 9, 2010, Eric Edelman, Ph.D, completed a psychiatric review technique form ("PRTF") for the Social Security Administration ("SSA"), assessing plaintiff's condition from January 1, 2010 (the alleged onset date) to the present.  (Tr. at 264.)  Dr. Edelman evaluated the case under Listing 12.04 (Affective Disorders) based on plaintiff's bipolar syndrome.  (Tr. at 267.)  Under the B criteria, Dr. Edelman found mild restriction of ADL's, mild difficulties in maintaining social functioning, moderate difficulties in maintaining CPP, and no episodes of

11

decompensation. (Tr. 274.) In an accompanying mental residual functional capacity ("MRFC") report,[14] Dr. Edelman found plaintiff moderately limited in his ability to understand and remember detailed instructions but not significantly limited in other areas of understanding and memory; not significantly limited in the ability to carry out very short and simple instructions but moderately limited in all other areas related to sustained concentration and persistence; not significantly limited in all aspects of social interaction; and, in the area of adaptation, moderately limited in the ability to respond appropriately to changes and make plans independently of others, but not significantly limited in taking appropriate precautions and using public transportation. (Tr. at 278-79.) Dr. Edelman concluded that plaintiff retained "the basic mental capacity for unskilled work. He may have moderate difficulty with concentration, pace, and persistence." (Tr. at 280.)

On July 15, 2010, Dr. Sorem completed a psychiatric questionnaire, listing a diagnosis of bipolar I, recent episode mixed-severe. She indicated that the chart did not reveal any disturbances in short and long term memory, and plaintiff appeared to be alert and oriented times three. He possibly had ADHD according to older records prior to July 10, 2009. The notes indicated that plaintiff was "non-delusional or no delusions, hallucinations, or illusions

---

[14]If a claimant's mental impairment is severe but does not meet or equal a Listing, his mental RFC ("MRFC") must be assessed. 20 C .F.R. § 404.1520a(d)(3). This assessment, used at steps four and five of the sequential evaluation process, requires a more detailed evaluation, itemizing various functions contained in the broad categories found in paragraph B of the Listings. See SSR 96-8p; Hendrickson v. Astrue, No. 5:11-927, 2012 WL 7784156, at *3 (N.D.N.Y. Dec.11, 2012) (explaining that mental RFC requires consideration of four broad categories: understanding and memory, sustained concentration and persistence, social interaction, and adaptation), adopted, 2013 WL 1180864 (N.D.N.Y. Mar. 20, 2013); see also SSR 85-16 (stating that evaluation of a person's ability to perform unskilled work "includes consideration of the ability to understand, to carry out and remember instructions and to respond appropriately to supervision, coworkers, and customary work pressures in a work setting").

12

dating back to 7-28-2006." (Tr. at 282.)  Dr. Sorem further noted that the chart reflected no retardation or agitation, suicidal ideation, crying spells, anxiety or panic attacks, deterioration in personal habits, constriction of interests or any difficulty in initiating or persisting at tasks or daily activities, or tardiness for work or appointments.  Records from 2007 noted a volatile home situation and several incarcerations, but the chart revealed no conflicts with supervisors. (Tr. at 283.)  He was hospitalized in 2005 and 2006.  Asked to estimate plaintiff's IQ, Dr. Sorem indicated: "MD's indicate normal intelligence."  (Tr. at 284.)  She concluded that plaintiff did seem to be responding to medication treatment, but his prognosis remained guarded as plaintiff did not always remember to take his medications.  He "quite possibly" could understand, carry out, and remember instructions, and "quite possibly" respond appropriately to supervisors and co-workers, given his reported employment.  Dr. Sorem did not know if this was full-time or part-time employment.  He was able to handle funds, as his judgment appeared good per chart records.  (Tr. at 284.)

Plaintiff returned to Dr. Sorem's office on July 20, 2010, upset that the notes from her office were not supportive of him getting social security.  Dr. Sorem reviewed the notes, none of which were particularly condemning of him getting benefits, but she noted that because he had been functional enough to have conversations with her, was not psychotic and not having a lot of severe manic or depressive episodes, social security would likely see him as relatively stable.  They had increased his Zyprexa at the last visit, but he indicated that things got worse, so Dr. Sorem took the dose back down.  Plaintif described periods of time when he could not focus and became agitated, so Dr. Sorem decided to check his Lithium level and consider an increase in Lithium.  Objectively, he was alert, oriented times three, and cooperative.  His affect was a little angry but mood okay.  He denied suicidal or homicidal thoughts.  No thought

process or thought content disorders were noted, and insight and judgment were good. (Tr. at 289, 344.)

On August 13, 2010, plaintiff told Dr. Sorem he was not doing well on Zyprexa, feeling sluggish in the morning even after eight to ten hours of sleep. It appeared Zyprexa was no longer working, so Dr. Sorem prescribed Depakote,[15] which plaintiff had used in the past, to stabilize mood and help him get decent sleep without feeling groggy in the morning. Objectively, plaintiff appeared alert, pleasant, and cooperative, with full range affect and good mood. No thought disorders were noted, and he made good eye contact. Plaintiff indicated that work was going okay, and that he spent time with his mother in the afternoons before going to work. Dr. Sorem started plaintiff on Depakote and continued Lithium, with the option of increasing Lithium if he needed some more mood stability. (Tr. at 290.)

On September 1, 2010, plaintiff went to the Mercy Hospital Emergency Room complaining of constipation. The doctor saw no need for a radiographic work-up, providing a bottle of magnesium citrate and prescription for Colace. (Tr. at 304.)

On September 3, 2010, plaintiff advised Dr. Sorem that he had gone off the Depakote shortly after he started it "because he just wasn't feeling very good on it." (Tr. at 291, 345.) He felt he needed a medication in addition to Lithium "to get things settled." (Tr. at 291, 345.) He complained of limited sleep, agitation, irritability, and constipation (for which he had recently gone to the ER). Objectively, he demonstrated appropriate affect, good mood, with no thought process or content disorders and intact cognitive functions. Dr. Sorem offered to restart him on numerous other medications that he had taken before, but he "had a reason not to take

---

[15]Depakote is used to treat manic episodes related to bipolar disorder. http://www.drugs.com/depakote.html.

14

each and every one of those" so Dr. Sorem suggested Saphris, a new mood stabilizing drug, and plaintiff agreed to give it a try. (Tr. at 291, 345.) Three hours later, plaintiff returned to Dr. Sorem's office, indicating he had taken a Saphris and felt like he was having some kind of strange allergic reaction, feeling light-headed and buzzy. Dr. Sorem checked his blood pressure, which read 110/80, and noted that he did not seem diaphoretic or short of breath. Dr. Sorem asked him to go home, indicating the only thing she would be concerned about would be some kind of rash or shortness of breath. Plaintiff then requested to restart on Zyprexa, so Dr. Sorem gave him a one week supply. (Tr. at 291, 345.) Plaintiff received additional Zyprexa on September 17, 2010. (Tr. at 340.)

On October 22, 2010, plaintiff returned to Dr. Sorem, indicating that with the Zyprexa and Lithium he was sleeping just four to five hours per night, and that he felt groggy when he woke up. He felt that he was sometimes on the verge of a manic episode due to not sleeping well, so Dr. Sorem decided to add Trazodone for sleep. Objectively, Dr. Sorem found plaintiff alert, oriented times three, pleasant, and cooperative, with appropriate affect, good mood, and no suicidal/homicidal thoughts or hallucinations/delusions. (Tr. at 292.)

On November 4, 2010, consultant Esther Lefevre, Ph.D., reviewed the updated file evidence for the SSA, noting that plaintiff continued to work with his provider to find the right combination of medications. However, he remained stable and presented quite normally. A recent note indicated that he was working but without further description. Dr. Lefevre affirmed Dr. Edelman's PRTF and MRFC as written. (Tr. at 294.)

On December 3, 2010, plaintiff told Dr. Sorem things were going very well with his medications of Lithium, Zyprexa, and Trazodone. He indicated that moving to first shift at work had also made a big difference. Objectively, he was alert, oriented times three, pleasant, and

cooperative.  He denied suicidal or homicidal thoughts, affect was bright and mood good, with no psychotic symptoms.  Dr. Sorem continued medications.  (Tr. at 338, 346.)

On February 16, 2011, plaintiff again advised Dr. Sorem that things were going well.  He reported spending time with a girl, although she told him she only wanted to be friends, news he took well.  He reported only getting ten hours of work per week, so money was tight.  He had applied at some temporary services and was hoping to get some hours.  However, Dr. Sorem noted: "The thought of him applying for fulltime work is frightening to him because he fears that he will not be able to manage a fulltime job given his mental illness." (Tr. at 337.)  He was managing quite well on his current dosages of Lithium, Zyprexa, and Trazodone.  Objectively, he was alert, oriented times three, pleasant, and cooperative, with bright affect and good mood.  He demonstrated good hygiene and grooming, made good eye contact, with normal speech and no psychotic symptoms, racing thoughts, or pressured speech.  His mood was quite stable.  Intelligence was in the average to above range, and insight into his illness was good.  Dr. Sorem continued medications.  (Tr. at 337.)

On April 20, 2011, plaintiff went to the Mercy ER, complaining of diarrhea.  He reported taking Lithium and Zyprexa and recently starting Hydroxyzine,[16] which coincided with the onset of his symptoms.  Dr. Wade Burkard stopped Hydroxyzine and started plaintiff on Xanax for anxiety.  (Tr. at 302.)

On April 29, 2011, plaintiff returned to Dr. Sorem, complaining of diarrhea.  Dr. Sorem suggested he cut back on Lithium – from 1200 mg to 900 mg per day – to see if that made a difference.  Objectively, he was alert, oriented times three, pleasant, and cooperative.  He

---

[16]Hydroxyzine is used for anxiety and to treat the symptoms of alcohol withdrawal.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682866.html.

stated things were going quite well on his medications of Zyprexa and Lithium.  (Tr. at 335.)

On June 3, 2011, plaintiff told Dr. Sorem things were going fairly well.  He did feel on the verge of diarrhea again with the Lithium at 900 mg, so Dr. Sorem suggested cutting back to 600 mg.  Plaintiff expressed concern about mania if the Lithium dose were decreased, so Dr. Sorem suggested increasing Zyprexa.  Plaintiff indicated he had done that before and was uncomfortable with the side effects.  Dr. Sorem suggested Trileptal, but plaintiff wanted to wait until he had completed a course of medications for a urinary tract infection before making a decision.  Objectively, Dr. Sorem again found plaintiff alert, oriented times three, pleasant, and cooperative, with good eye contact, no suicidal/homicidal ideation or hallucinations/delusions. He displayed no pressured speech or other signs of mania.  Dr. Sorem continued current medications of Lithium and Zyprexa but decreased the Lithium dose.  (Tr. at 333.)

On June 6, 2011, Dr. Sorem decided to hold Lithium due to plaintiff's complaints of urinary retention.  (Tr. at 334.)  On June 15, plaintiff told Dr. Sorem he was doing quite well on Zyprexa by itself.  Objectively, he was alert, oriented times three, pleasant, and cooperative. His affect was appropriate and mood good, with no thoughts of harm to self or others, and no psychotic symptoms.  Dr. Sorem continued Zyprexa and recommended plaintiff see a urologist for his complaints of urinary hesitancy.  (Tr. at 332, 339.)

## C.    Hearing Testimony

On September 14, 2011, plaintiff appeared with counsel for his hearing before the ALJ on the 2010 application.  The ALJ also summoned a medical expert ("ME") and vocational expert ("VE") to the hearing. (Tr. at 51.)

17

### 1.    Plaintiff

Plaintiff testified that he was thirty years old, 6'2" tall and 240 pounds.  His highest level of education was eleventh grade.  (Tr. at 56.)  He indicated that he had been employed at CSI Media doing bindery work for the past three and a half years.  (Tr. at 56-57.)  He worked three to four days per week, on the day shift, about twenty to twenty-five hours per week, with his work schedule varying from ten to twenty-eight hours per week during his time there.  (Tr. at 57.)

Plaintiff testified that he took Zyprexa, "an anti-psych med."  (Tr. at 58.)  He initially denied any side effects from this medication (Tr. at 58) but later stated that it made him sleepy at night (Tr. at 62).  He lived in a one bedroom apartment with his cat for the past two years.  (Tr. at 58.)  Asked if he could take care of the place, he indicated that he did not clean up after himself.  He sometimes cooked his own meals but often went to his mother's.  He was able to pay his own bills, manage a checking account, and drive, but his mother helped with shopping.  (Tr. at 59.)  He denied belonging to any social groups and spent time watching sports and playing video games with a friend.  (Tr. at 60.)  He indicated that he was able to read and write.  (Tr. at 61.)

Plaintiff denied that he could work more than part-time hours, stating:

> I become manic because I've, just, working a long time, it affects me and then I have this thing were I, you know, I go to it and I don't know if I want to be there or not and then I leave.  And I've done that in the past with a lot of other jobs. I've second-guessed myself, you know, like if I want to be there or not.  And then I just go with my instinct of leaving and then I do.

(Tr. at 62.)  He further explained that during a manic episode he got headaches and became argumentative.  "And then it just explodes from there, it gets worse."  (Tr. at 63.)  He indicated that he had some problems at his current job when working second shift due to lack of sleep,

but things had improved since he moved to first shift.  (Tr. at 63.)  Plaintiff testified that he saw his doctor every two months for medication management of his manic-depressive disorder.  (Tr. at 64.)

### 2.    Medical Expert

The ME, Allen Hauer, Ph.D, evaluated plaintiff under Listing 12.04, based on the evidence of bipolar disorder with hypomania, and Listing 12.05, based on the evidence of BIF, including IQ scores in the mid-seventy range.  (Tr. at 65-66.)  However, the ME also noted academic testing indicating average range ability, which suggested that plaintiff's intellectual capacity was actually higher than the mid-seventies.  (Tr. at 66-67.)  Regarding functional limitations, the ME found mild restriction of ADL's based on the evidence that plaintiff lived alone and independently, with the ability to set a schedule, make plans and carry them out. (Tr. at 67.)  The ME also found mild limitations in social functioning, based on the records describing plaintiff as well-mannered, pleasant, and cooperative, although under certain circumstances prone to irritability.  (Tr. at 67-68.)  The ME further found mild limitations in CPP. The cognitive aspect of concentration would be reduced given his borderline functioning, however, the ME did not believe that either condition would have much of an effect on plaintiff's overall efficiency in carrying out familiar tasks.    Finally, the ME saw no episodes of decompensation.  (Tr. at 68.)

### 3.    Vocational Expert

The VE, Karl Botterbusch, Ph.D, classified plaintiff's current job as a bindery sorter as unskilled, light work, and his past work as a label coder as unskilled, light; and materials handler, unskilled or semi-skilled, heavy.  (Tr. at 72-73.)  The ALJ then asked a hypothetical

question, assuming an individual with no exertional limitations, available only for simple, routine, and repetitive work. The person was able to understand, carry out, and remember simple instructions; able to respond appropriately to supervisors, coworkers, and the public; and able to adjust to routine changes in the work setting. The VE testified that such a person could perform plaintiff's current work, as well as his past work as a production assembler, materials handler, and label coder. (Tr. at 74.) The person could also perform other jobs in the economy, such as hand packager and machine packager. (Tr. at 75.) If psychological factors caused the person to be absent from work two or more random days each month, no work could be done. If the person could not complete eight hours a day, five days per week, he would also be unemployable. (Tr. at 75.)

## D.     ALJ's Decision

On October 12, 2011, the ALJ issued an unfavorable decision. (Tr. at 25.) At step one, the ALJ found that plaintiff had not engaged in SGA since the alleged onset date of January 1, 2010. The record showed that plaintiff had worked since then but only part-time (twenty to twenty-five hours per week), which did not rise to SGA levels. (Tr. at 30.) At step two, the ALJ found plaintiff's affective disorder to be a severe impairment. (Tr. at 30.) The ALJ noted that in his previous decision on plaintiff's 2005 application he found plaintiff's BIF to be a severe impairment based on 2003 testing showing an IQ of 72-81. However, the ALJ gave controlling weight to the more recent records from Dr. Sorem, plaintiff's treating psychiatrist, which indicated that plaintiff had average to above average intelligence. The ALJ thus found plaintiff's BIF non-severe in adjudicating the 2010 application. (Tr. at 31.)

At step three, the ALJ found that plaintiff's impairments did not satisfy the B criteria of the mental impairment Listings. Specifically, the ALJ found mild restriction of ADL's, based on

20

evidence that plaintiff lived alone, cared for a cat, independently completed personal care, prepared simple meals, did laundry and housework, shopped in stores, paid bills, drove, watched television, and played video games. The ALJ also found mild difficulties in social functioning, based on evidence that plaintiff went out daily and alone, shopped in stores, and played video games with friends. The ALJ noted plaintiff's history of irritability and social difficulty, but found no evidence of such problems since the alleged onset date. The ALJ specifically cited the statement from plaintiff's employer that plaintiff got along well with supervisors and co-workers and the treatment notes describing plaintiff as cooperative and having normal affect. In the area of CPP, the ALJ found moderate difficulties, based on plaintiff's reported trouble with comprehension and paying attention. The ALJ noted plaintiff's current employment part-time doing unskilled work, and his employer's report that plaintiff requested to work limited hours. (Tr. at 31.) However, during treatment plaintiff commented that he was looking for temporary work to increase his hours, and plaintiff's employer reported that he had acceptable attendance and satisfactory work performance. (Tr. at 31-32.) Plaintiff's psychiatrist previously noted difficulties in this area, but in a report completed after the alleged onset date she noted no such difficulties. Finally, the ALJ found no episodes of decompensation of extended duration since the alleged onset date. (Tr. at 32.)

At step four, the ALJ found that plaintiff retained the RFC to perform the full range of work at all exertional levels but with the following non-exertional limitations: "The claimant is available for simple, routine, and repetitive work. He is able to understand, carry out and remember simple instructions. He is able to respond appropriately to supervisors, coworkers and the public. Finally, he is able to adjust to routine changes in the work place." (Tr. at 32.) In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion

21

evidence. (Tr. at 32.)

In considering plaintiff's testimony, the ALJ first noted the previous closed period of disability ending October 15, 2009, after a series of social conflicts, episodes of decompensation, and difficulty living independently. In the instant proceeding, plaintiff alleged that he continued to suffer from severe symptoms such that he could not sustain full-time work. He claimed that even with his current part-time hours he had at times not shown up for work, left early, and gotten argumentative. He alleged that these symptoms significantly limited his ability to perform work-related activities and to function appropriately in a routine work environment. (Tr. at 33.) The ALJ then stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 33.) The ALJ provided several reasons for his finding. First, the ALJ noted that plaintiff's treatment had been routine and conservative in nature, and the medical records revealed that medications had been relatively effective in controlling plaintiff's symptoms, with repeated notations that he was "doing quite well" on medications. Plaintiff alleged no medication side effects at the hearing. He did report some transient symptoms after his medications were adjusted, but the medical records continued to note fairly normal mental status, with no evidence of deficits in cognitive functioning, mood, social functioning, or thought process. Plaintiff was also able to continue working through these symptoms. (Tr. at 33.)

Second, plaintiff failed to mention his allegedly disabling symptoms on numerous occasions. (Tr. at 33.) While plaintiff alleged severe comprehension and social difficulties,

22

during treatment he was described as having good mood, good hygiene and grooming, normal speech, no psychosis or thought disorder, no lack of interest in daily activities, average intelligence, no memory problems, and no social difficulties. (Tr. at 33-34.)

Third, while plaintiff alleged that he performed little if any, housework, the ALJ noted that he lived alone and did not report receiving any particular help in maintaining the residence. The ALJ further noted that plaintiff continued to work after the alleged onset date. While that activity did not constitute disqualifying SGA, it did indicate that plaintiff's daily activities had, at least at times, been somewhat greater than plaintiff generally reported. Plaintiff stated that he feared he could not maintain full-time work, but his psychiatrist commented that he was currently managing work quite well on medication, plaintiff at one point stated that he was applying for temporary work to get more hours, and his employer reported no problems with his work. The ALJ also noted that plaintiff's work activity since the alleged onset date was more significant than in many years prior to the time he alleged he became totally disabled. "This is not fully consistent with the claimant's allegations that he would be unable to sustain full-time work." (Tr. at 34.)

Regarding the opinion evidence, the ALJ noted that the record contained no opinions from treating or examining physicians indicating that plaintiff was disabled or had greater limitations; given plaintiff's allegations of disabling symptoms, one would expect to see some indication in the treatment records of restrictions on plaintiff from a treating doctor. Instead, the ALJ found the recent opinion from plaintiff's treating psychiatrist consistent with the ALJ's RFC. Specifically, the psychiatrist noted no limitation in plaintiff's ability to understand, remember, and carry out instructions; or respond appropriately to supervision and co-workers, and routine work pressures and changes in the work setting. The ALJ also found that the RFC conclusions

23

reached by the state agency consultants (Drs. Edelman and Lefevre) were consistent with his decision and supported a finding of not disabled. Likewise, the ME who testified at the hearing indicated that plaintiff was no more limited than set forth in the ALJ's decision, testifying that plaintiff's mental impairments caused no more than mild limitations in his functioning. Finally, the ALJ gave little weight to the opinions given prior to the alleged onset date, as the record showed that plaintiff's condition had improved. The ALJ also gave little weight to the statements from plaintiff's mother, as they were not fully consistent with plaintiff's ability to live alone, perform adequately at work, and the reports that he was doing well during treatment. (Tr. at 34.)

The VE testified that, given this RFC, plaintiff would be able to perform his past work as a bindery inserter, production assembler, label coder, and materials handler. However, because this work did not rise to the level of substantial gainful activity, the ALJ proceeded to step five. (Tr. at 35.) Considering plaintiff's age, education, work experience, and RFC, the ALJ found that plaintiff could perform other jobs as identified by the VE, including hand packager and machine packager. (Tr. at 35-36.) The ALJ thus found plaintiff not disabled from January 1, 2010 through the date of decision. (Tr. at 36.)

### III. DISCUSSION

Plaintiff argues that the ALJ erred in (1) concluding that the state agency consultants' reports supported his decision; (2) finding that no treating source report supported a finding of disability; (3) evaluating his intellectual functioning; (4) determining credibility; and (5) formulating RFC. Given the deferential standard I must apply to the ALJ's evaluation of the evidence, plaintiff's arguments about treating source opinions, intellectual functioning, and credibility fall short. But I agree that the decision cannot stand because the ALJ failed to

24

include in the RFC and his hypothetical questions to the VE all of the limitations supported by the record, including the consultants' reports. The matter must therefore be remanded. For the sake of completeness, I address each of plaintiff's arguments in turn.

## A.    Consultants' Reports

The ALJ must consider the opinions of state agency medical and psychological consultants, as they "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p. In weighing such opinions, the ALJ considers the supportability of the opinion in the evidence, including any evidence received at the hearing level that was not before the state agency; the consistency of the opinion with the record as a whole, including other medical opinions; any explanation for the opinion provided by the consultant; and any specialization of the consultant. SSR 96-6p.

As indicated above, in this case the ALJ found the RFC conclusions reached by the state agency consultants consistent with his decision and supportive of a finding of not disabled. (Tr. at 34.) Plaintiff argues that the ALJ ignored the various "moderate" limitations in Dr. Edelman's reports[17] and failed to otherwise explain how he weighed the consultants' reports under the SSR 96-6p factors.

The Commissioner responds that the "moderate" limitations upon which plaintiff relies come primarily from the "summary conclusions" portion of the MRFC form ("section I"), which is merely a worksheet to aid in deciding the presence and degree of functional limitations and does not constitute the RFC assessment; the actual mental RFC assessment is set forth in

---

[17]As indicated above, under the B criteria Dr. Edelman found moderate difficulties in maintaining CPP (Tr. at 274), as well as various moderate limitations in the four areas of MRFC (Tr. at 278-29). Dr. Lefevre agreed with his conclusions. (Tr. at 294.)

section III of the report.  See Program Operations Manual System ("POMS") DI 24510.060B. In section III, Dr. Edelman indicated that plaintiff retained "the basic mental capacity for unskilled work." (Tr. at 280.)  Courts have held that the ALJ may rely on a more specific finding in section III.  E.g., Schurr v. Colvin, No. 12-C-0969, 2013 WL 1949615, at *15 (E.D. Wis. May 9, 2013) ("The ALJ did not err in crediting the more specific, narrative portion of [the state agency doctor's] report, rather than the check-boxes."); Malueg v. Astrue, No. 06-C-676, 2007 WL 5480523, at *7 (W.D.Wis. May 30, 2007) ("The ALJ relied on Dr. Matkom's psychiatric Review Technique Form Section III Rating of Functional Limitations and his notes in Section IV to conclude that plaintiff had only moderate limitations and could perform low stress routine work if she abstained from alcohol.  The ALJ did not err by not using the Section I worksheet portion of the Mental RFC form in determining plaintiff's RFC finding."); see also Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir. 2002) (finding that the ALJ did not err in relying on specific RFC assessment that the claimant could still perform low-stress, repetitive work, rather than finding that the claimant was "moderately limited" in his ability to maintain a regular schedule and attendance).

In reply, plaintiff contends that the Commissioner's response misses the point because plaintiff did not base his argument on the notion that the ALJ was required to include in the RFC all of the moderate limitations given by Dr. Edelman.  Rather, plaintiff argues that the ALJ was required to weigh Dr. Edelman's RFC conclusions under the SSR 96-5p and 96-6p standards.

Of course, the mere fact that a state agency consultant fills out section III of the MRFC form does not mean that the ALJ is required to accept the doctor's conclusion; nor does the ALJ's adoption of a section III RFC relieve him of the duty to evaluate the supportability of the

consultant's opinion. In some cases, the consultant's opinion may be contrary to the other evidence, such as a treating source report. See, e.g., Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."). In others, the consultant's report may be internally inconsistent because he failed account in section III for limitations he endorsed in section I. See, e.g., Doty v. Astrue, No. 11-cv-01342, 2012 WL 4511396, at *4 (D. Colo. Sept. 30, 2012) (explaining that the POMS requires the section III narrative statement to address each of the four mental categories (Understanding and Memory, Concentration and Persistence, Social Interaction, and Adaptation) covered in section I) (citing Baysinger v. Astrue, No. 11-cv-00333, 2012 WL 1044746, at *6 (D. Colo. Mar. 28, 2012)). And, if the ALJ does rely on section III of a consultant's report, he ordinarily must include in the RFC all of the limitations set forth therein.

In the present case, as discussed in sections B. and C. below, there are no medical source opinions from the relevant time period supporting greater limitations. Nor does it appear that Dr. Edelman's section III RFC omitted significant data from section I. However, as I will also discuss below, the ALJ's RFC failed to account for all of plaintiff's limitations, including the CPP limitation set forth in section III of Dr. Edelman's report. See Kadletz v. Astrue, No. 09-C-1101, 2010 WL 2926198, at *17 (E.D. Wis. July 26, 2010) (remanding where the ALJ omitted from the RFC limitations endorsed by the consultants).

## B.     Treating Source Opinions

Opinions from a social security claimant's treating physician are entitled to "special significance." SSR 96-8p. Such opinions must be given "controlling weight" if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with

27

the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). Treating source opinions that do not meet the test for controlling weight are still entitled to deference and must be weighed according to a checklist of factors, see SSR 96-2p, including the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion. 20 C.F.R. § 404.1527(c)(2); Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011); see also Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008). The ALJ must always provide "good reasons" for discounting the opinion of a treating physician. 20 C.F.R. § 404.1527(c)(2); Scott, 647 F.3d at 739.

In the present case, the ALJ indicated that plaintiff's treating physician offered no opinion that plaintiff was disabled or subject to greater limitations. Instead, the ALJ found that Dr. Sorem's opinions were consistent with the ALJ's RFC.

Plaintiff argues that it was unfair for the ALJ to fault him for not producing a treating source opinion that he is "disabled." Because the issue of disability is reserved to the Commissioner, plaintiff contends that the ALJ would have dismissed such a statement. The regulations state that treating source opinions on issues reserved to the Commissioner are not medical opinions entitled to special significance, 20 C.F.R. § 404.1527(d); SSR 96-5p, and may not be afforded controlling weight, see SSR 96-2p. But that is "not the same thing as saying that such a statement is improper and therefore to be ignored." Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012). The ALJ must still consider the opinion and the course of treatment the doctor provided. See, e.g., Liegel v. Colvin, No. 12-C-209, 2013 WL 3830108, at *9 (W.D. Wis. July 23, 2013). Therefore, it was not improper for the ALJ to note the absence of a treating source opinion claiming disability. In any event, the ALJ's primary point was that Dr.

28

Sorem imposed no limitations greater than what was set forth in the RFC.

Plaintiff argues that the ALJ was wrong to say that the treating doctor imposed no restrictions. He points to Dr. Sorem's October 2009 report setting a GAF of 50 and endorsing a variety of symptoms. (Tr. at 248-49.) Dr. Sorem further opined that plaintiff would have difficulty "working at a regular job on a sustained basis." (Tr. at 249.) The ALJ did not ignore this opinion, as plaintiff alleges. Rather, he gave it little weight because it pre-dated the alleged onset date, and the record showed that plaintiff's condition had improved.[18] (Tr. at 34.)

Plaintiff also argues that the ALJ erred in finding Dr. Sorem's opinion consistent with his RFC finding. In making this finding, the ALJ referred to Dr. Sorem's July 2010 report (Tr. at 34, citing Exhibit 6F), not the October 2009 report. As the ALJ noted, in the 2010 report Dr. Sorem endorsed no limitations on plaintiff's ability to understand, carry out, and remember instructions; respond appropriately to supervisors and co-workers; and respond appropriately to routine work pressures and changes in a work setting (Tr. at 34, 284), the basic mental demands of unskilled work, see SSR 85-15. Dr. Sorem did not, in her July 2010 report, reaffirm her previous conclusion that plaintiff would have difficulty working at a regular job on a sustained basis.[19] Nor, as the ALJ noted, did Dr. Sorem's post-onset treatment notes reflect any

_____

[18]As the ALJ noted (Tr. at 33), the post-onset date treatment notes indicated that plaintiff was "doing quite well" on medication (Tr. at 255; see also Tr. at 332 – "Zyprexa . . . is doing quite well for him"; Tr. at 333 – "things are going fairly well for him"; Tr. at 335 – "things are really going quite well on these medications"; Tr. at 337 – "things have been going well"; Tr. at 338 – "things are going well with his medication".)

[19]Plaintiff notes in reply that Dr. Sorem was not asked, in the July 2010 questionnaire, to opine on plaintiff's ability to sustain work. However, the report did ask Dr. Sorem about plaintiff's ability to persist at tasks or daily activities and complete tasks or daily activities in a timely manner; Dr. Sorem identified no such problems, specifically noting the absence of chart notes that plaintiff was late for work or for appointments. (Tr. at 283.)

disabling limitations or inability to work on a sustained basis; plaintiff reported some transient symptoms after his medications were adjusted, but mental status exams consistently revealed no evidence of deficits in his cognitive function, mood, social functioning, or thought process. He also continued working through these symptoms, without any evidence of work difficulties. (Tr. at 33, 255, 256, 257, 289, 291, 292, 338.)  Therefore, I cannot find error in the ALJ's consideration of the treating source evidence.

## C.    Intellectual Functioning

As indicated, in his 2009 decision awarding benefits the ALJ found plaintiff's BIF to be a severe impairment, citing the IQ scores assigned by Drs. Halvorson and Fugette.  (Tr. at 87, 298, 325.)  However, in his decision on the instant application the ALJ found this impairment non-severe, giving controlling weight to Dr. Sorem's opinion, expressed in the October 2009 and July 2010 reports, as well as her treatment notes, that plaintiff was of average intelligence. (Tr. at 31, 249, 256, 284, 337.)

Plaintiff argues that there is no reason to believe that his IQ improved after the first decision.  See 20 C.F.R. § 404, Subp. P, App. 1, § 112.00(D)(10) (indicating that IQ scores generally do not change after age sixteen).  Plaintiff also criticizes the ALJ for cherry-picking the IQ assessment from the October 2009 report, while rejecting the balance of that report.[20]

_____

[20]As indicated, the ALJ credited not just the October 2009 report on this issue, but also Dr. Sorem's July 2010 report and her post-onset treatment notes.  Further, the ALJ may reasonably adopt some portions of a report while rejecting others.  See SSR 96-5p (explaining "that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, . . . and that it may be necessary to decide whether to adopt or not adopt each one").  Finally, as also discussed above, the ALJ explained why he gave little weight to Dr. Sorem's pre-onset date opinion of significant limitations in light of her post-onset date report and the post-onset treatment notes reflecting improvement with treatment.

30

Finally, plaintiff faults the ALJ for ignoring the ME's testimony regarding his intellectual functioning. (Tr. at 66-67.) [21]

Even if the ALJ erred in this regard, as plaintiff acknowledges, the error would be harmful only if the ALJ failed to include corresponding limitations in the RFC. See Arnett v. Astrue, 676 F.3d 586, 591 (7th Cir. 2012). While the ALJ must in setting RFC "consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation," Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009), the burden at step four of the process (at which RFC is determined) is on the claimant, see, e.g., Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000) ("The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner."). The ALJ limited plaintiff to simple, routine, and repetitive work, and plaintiff fails to specifically identify any evidence supporting greater limitations due to his intellectual functioning. See, e.g., Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008) (holding that an RFC finding for simple, routine, and

---

[21]The ME acknowledged plaintiff's IQ scores in the mid-70 range, but he further noted the academic testing indicating average range ability, "which would suggest that his intellectual capacity is actually higher than the mid-70s. One doesn't acquire academic skills beyond their intellectual potential." (Tr. at 66-67.) It is true, as plaintiff notes in his reply brief, that the ME did ultimately state "that the mid- to high-range of the borderline range would be what would be most appropriate." (Tr. at 67.) However, as the ALJ noted, the ME found only mild limitations based on plaintiff's intellectual functioning and his bipolar disorder (Tr. at 34, 68), which supported the ALJ's conclusion. See 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe[.]"). Plaintiff notes in reply that if the ALJ fully agreed with the ME he would have found no severe mental impairments at all; instead, the ALJ found plaintiff's affective disorder severe. (Tr. at 30.) On this issue, the ALJ stated that the ME found plaintiff "no more limited than indicated in this decision." (Tr. at 34.) Plaintiff contends that this was wrong, as the ME disagreed with the ALJ on the issue of borderline intelligence. But the ME did not find any of plaintiff's mental impairments severe. That the ALJ chose to continue the analysis, rather than denying the claim at step two, cannot be error. As discussed in the text, the ultimate issue is whether the ALJ appropriately accounted for all of plaintiff's limitations in the RFC.

31

repetitive work captured the assessment of borderline intellectual functioning); Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2007) (finding that limitation to simple, routine, repetitive work adequately accounted for finding of borderline intellectual functioning); Gerow v. Astrue, No. 12-C-0080, 2013 WL 173795, at *4 (E.D. Wis. Jan. 16, 2013) (Griesbach, J.) ("The record adequately supports the ALJ's mental RFC finding, limiting Gerow to simple, routine, and repetitive work, because the medical records illustrated that Gerow's borderline intellectual functioning was the reason for the limitation.").

## D.    Credibility

In evaluating the credibility of a claimant's statements regarding pain, limitations, or other symptoms, the ALJ must first determine whether the claimant has a medically determinable physical or mental impairment that could reasonably be expected to produce his symptoms. If he does not, the symptoms cannot be found to affect his ability to perform basic work activities. SSR 96-7p. In the claimant does have such an impairment, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit his ability to perform basic work activities. If the claimant's statements are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of his statements based on the entire case record, including the claimant's daily activities; the frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, for relief of symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to his symptoms. SSR 96-7p. The ALJ may not reject a claimant's testimony solely because it lacks support in the medical evidence. Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004). Finally, the ALJ must provide

32

"specific reasons" for his credibility findings, supported by the evidence in the record. SSR 96-7p. If he does so, his determinations will be afforded special deference, and the court will not overturn them unless they are "patently wrong." See Jones v. Astrue, 623 F.3d 1155, 1160 (7th Cir. 2010).

In this case, the ALJ started with the usual boilerplate – that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. at 33.) As has been said many times, this boilerplate fails to provide the specific reasons SSR 96-7p requires; it also gets things backwards, implying that the ability to work is determined first and is then used to determine the claimant's credibility, rather than evaluating credibility as an initial matter in order to come to a decision on the ultimate question of work capacity. Hunt v. Astrue, 889 F. Supp. 2d 1129, 1147 (E.D. Wis. 2012). However, as is also increasingly noted, if the ALJ has otherwise explained his conclusion adequately, inclusion of this language can be harmless. Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012); Richison v. Astrue, 462 Fed. Appx. 622, 625 (7th Cir. 2012); Felmey v. Colvin, No. 13-C-219, 2013 WL 4502090, at *14 (E.D. Wis. Aug. 22, 2013). The ALJ provided specific reasons here, but plaintiff finds fault with each of them.

Plaintiff first contends that in relying on his conservative treatment, his generally normal mental status during examinations, the effectiveness of his medications, and the absence of side effects (Tr. at 33, 58), the ALJ focused on a narrow range of Dr. Sorem's records from July to October 2010 (Tr. at 289-92; Hr'g Ex. 8F). That is incorrect; the ALJ also cited hearing exhibits 3F and 13F (Tr. at 33-34), which contained the rest of Dr. Sorem's notes. Plaintiff

33

contends that the ALJ skipped records discussing symptom exacerbations and medication side effects. However, the ALJ is not required to discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a finding of disability. Jones, 623 F.3d at 1162.

In reviewing the records plaintiff cites, I see no significant omissions. On October 22, 2010, plaintiff told Dr. Sorem that he sometimes felt on the verge of a hypomanic episode due to not sleeping well. Even then, however, Dr. Sorem noted stable mood. (Tr. at 292.) Dr. Sorem added Trazodone for sleep (Tr. at 292), and when plaintiff came back on December 3, 2010, he reported that things were going "very well" with his medication. He further reported that he had switched to first shift at work, which made a big difference. (Tr. at 338.) On his next visit on February 16, 2011, plaintiff again indicated that things were going well. He reported applying to temporary services to try to get more work hours, although he admitted concern that he could not handle full-time work due to his mental illness. (Tr. at 337.) On April 20, 2011, plaintiff went to the ER with diarrhea symptoms, which the doctor believed to be related to plaintiff's recent use of an anxiety medication. (Tr. at 302.) Plaintiff saw Dr. Sorem on April 29, continuing to complain of diarrhea but indicating that things were otherwise "really going quite well on these medications." (Tr. at 335.) Dr. Sorem suggested that he cut down from four 300 mg Lithium tablets to three to see if the diarrhea would resolve. She also suggested that he see a GI doctor. (Tr. at 335.) By June 3, 2011, the diarrhea had improved, although plaintiff stated that he felt "on the verge" of diarrhea again with the Lithium at 900 mg. Dr. Sorem decreased Lithium to 600 mg, continuing Zyprexa. (Tr. at 333.) A few days later, Dr. Sorem suspended Lithium (Tr. at 334), and on June 15, plaintiff told Dr. Sorem he was doing quite well on Zyprexa by itself. He made no mention of diarrhea, but he did complain of

34

some urinary hesitancy, for which Dr. Sorem suggested her see a urologist. (Tr. at 332, 339.) Nothing in this note related the urinary issues to plaintiff's psychiatric medications, and, as indicated above, at the hearing on September 14, 2011, plaintiff identified no medication side effects (Tr. at 58) – aside from some sleepiness at night (Tr. at 62). Thus, while the record suggests that plaintiff's diarrhea related to his medications, that symptom resolved within a few months; no medical evidence relates his urinary issues to the medication.[22] Contrary to plaintiff's suggestion, the notes he cites do not constitute substantial evidence undercutting the ALJ's conclusion that he could maintain full-time work with no medication complications.

Plaintiff next argues that the ALJ failed to explain how his continued part-time work (at more significant levels than prior to the alleged onset date), his application for more hours, and his employer's satisfaction with his work were "not fully consistent with [his] allegations that he would be unable to sustain full-time work." (Tr. at 34.) The inconsistency is sufficiently obvious that the ALJ did not need to offer further articulation. See, e.g., Berger v. Astrue, 516 F.3d 539, 546 (7th Cir. 2008) (acknowledging that even part-time work cuts against a claim of disability); cf. Melton v. Apfel, 181 F.3d 939 (8th Cir. 1999) ("Mr. Melton therefore performed part-time work equal to or above the level of his past relevant work for more than three years after the alleged onset date of his disability. We believe that these facts alone satisfy the standard of substantial evidence, even in light of evidence in the record tending to establish Mr. Melton's limitations with respect to lifting, standing or sitting for long periods, and performing other job-related tasks."). As the ALJ also noted, plaintiff's claim that he could not work full-time without risking a manic episode is supported by no post-onset medical evidence. (Tr. at 34.)

_____

[22]The June 3, 2011 note references a urinary tract infection, for which plaintiff was taking medications. (tr. at 333.)

Finally, plaintiff contends that the ALJ, in discussing daily activities, incorrectly found that he was able to live alone and maintain a residence without any particular help. (Tr. at 34, citing Ex. 5E/Tr. at 216-23.) Plaintiff notes that in the very report the ALJ cited his mother indicated that he needed reminders about personal care (Tr. at 217), neglected to clean his kitchen, sometimes brought his laundry to her house and ate with her (Tr. at 218), needed her to accompany him shopping, spent too much money (Tr. at 219), had a hard time concentrating (Tr. at 220), and did not get along well with others (Tr. at 221). The Seventh Circuit has criticized ALJs for equating household chores, particularly when completed with the assistance of others, to full-time employment. Hughes v. Astrue, 705 F.3d 276, 278 (7th Cir. 2013); see, e.g., Bjornson, 671 F.3d at 647 ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . ., and is not held to a minimum standard of performance, as she would be by an employer.").

However, in this case the ALJ did not dwell on plaintiff's household chores, devoting just two sentences to the issue. See Halsell v. Astrue, 357 Fed. Appx. 717, 722 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as enough of them are[.]"). The ALJ was more impressed by plaintiff's continued work, his employer's satisfaction with his performance, and his progress in treatment. (Tr. at 34.) Further, the ALJ considered plaintiff's mother's statement, giving it little weight because it was not consistent with plaintiff's ability to live alone, perform adequately at work, and his reports of doing quite well during treatment. (Tr. at 34.)[23]

_____

[23]Plaintiff notes that Dr. Edelman found his mother's statement credible (Tr. at 280), but credibility is an issue for the ALJ to determine. Plaintiff also faults the ALJ for a conclusory analysis of his mother's report, but the ALJ earlier in his decision provided a detailed discussion of plaintiff's work activity and his good progress in treatment. He was not required to repeat

36

In sum, I cannot find the ALJ's credibility determination patently wrong.

**E.    RFC**

Plaintiff's final argument is that in determining RFC the ALJ erred by failing to consider his ability to work full-time on a regular and continuing basis and his moderate limitations in CPP.  The only evidence plaintiff points to on the former point is (1) Dr. Sorem's October 2009 report, which the ALJ reasonably discounted, and (2) plaintiff's own statements, which the ALJ also considered and discounted.  Perhaps the ALJ could have explained his conclusion about plaintiff's ability to work full-time more thoroughly, but I cannot find reversible error on this point. See, e.g., Filus, 694 F.3d at 869 ("[W]e require only that the ALJ 'minimally articulate' his reasoning.").   However, plaintiff's argument regarding CPP gains traction.

In determining RFC, the ALJ must consider all limitations that arise from medically determinable impairments, even those that are not severe.  E.g., Villano v. Astrue, 556 F.3d 558, 563 (7th Cir. 2009); see also Terry, 580 F.3d at 477 ("[W]e have frequently reminded the agency that an ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation.").   Similarly, the ALJ ordinarily must orient the VE to the totality of a claimant's limitations.   "Among the limitations the VE must consider are deficiencies of concentration, persistence and pace."  O'Connor-Spinner, 627 F.3d at 619.

---

that analysis in discussing the mother's report.  See Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (explaining that, because it is proper to read the ALJ's decision as a whole, it would be a needless formality to have the ALJ repeat substantially similar factual analyses multiple steps).  Nor was the ALJ required to specifically discuss each statement in the report. See Pepper, 712 F.3d at 363 ("[A]n ALJ is not required to discuss every snippet of information from the medical records that might be inconsistent with the rest of the objective medical evidence.").

In the present case, the ALJ determined that plaintiff was limited to "simple, routine, and repetitive work." (Tr. at 32, 74.) The ALJ further found that plaintiff "is able to understand, carry out and remember simple instructions. He is able to respond appropriately to supervisors, coworkers and the public. Finally, he is able to adjust to routine changes in the work place." (Tr. at 32.) The ALJ's hypothetical question to the VE tracked this RFC. (Tr. at 74.) While the restriction to simple, routine, repetitive work may have accounted for plaintiff's intellectual limitations, nothing in the hypothetical question or the RFC accounted for the limitations in CPP related to plaintiff's affective disorder.[24] Just because a person is able to learn how to do tasks of a given complexity does not mean that he can stick with those tasks over a sustained period, as is required for full-time work. O'Connor-Spinner, 627 F.3d at 620 (citing Stewart v. Astrue, 561 F.3d 679, 684-85 (7th Cir. 2009) (limiting hypothetical to simple, routine tasks did not account for limitations of concentration, persistence and pace); Craft v. Astrue, 539 F.3d 668, 677-78 (7th Cir. 2008) (restricting hypothetical to unskilled work did not consider difficulties with memory, concentration or mood swings)); see also Kasarsky v. Barnhart, 335 F.3d 539, 544 (7th Cir. 2003) (explaining that the length of time it takes a person to learn to do a job is not the same as the ability of that person to perform consistently once trained).

The ALJ also said that plaintiff could handle simple instructions, interact with others, and adjust to changes, but that is simply a reiteration of the basic mental demands of unskilled work. SSR 85-15. It says nothing about plaintiff's limitations, in CPP or any other area, due

---

[24]As indicated above, Dr. Edelman noted such limitations based on plaintiff's bipolar disorder in section III of his MRFC report (Tr. at 280), and the ALJ cast no doubt on that conclusion; indeed, at step three, the ALJ agreed that plaintiff was so limited (Tr. at 31). Thus, the ALJ was required to account for plaintiff's moderate CPP limitation in the RFC.

Case 2:13-cv-00015-LA   Filed 09/17/13   Page 38 of 40   Document 22

to his affective disorder, and the Seventh Circuit has rejected the notion that confining a claimant to simple, unskilled work suffices to account for a limitation in CPP. E.g., Stewart, 561 F.3d at 685; cf. Gerow, 2013 WL 173795, at *5 (affirming where the RFC for simple, routine, and repetitive work accounted for moderate limitations in CPP stemming from borderline intelligence and record showed no connection between the claimant's depression and his ability to concentrate, persist, or pace).

The Commissioner relies on Sims v. Barnhart, 309 F.3d 424, 431 (7th Cir. 2002), in which the court affirmed (over Judge Posner's dissent) an RFC for "simple and repetitive" work. But in that case the ALJ also limited the claimant to low stress work, and the record showed that her CPP limitations arose in part from a panic disorder. As the court explained in O'Connor-Spinner, 627 F.3d at 619, omission of a CPP limitation from the hypothetical may be overlooked when the "claimant's limitations were stress- or panic-related and the hypothetical restricted the claimant to low-stress work." Thus, in Johansen v. Barnhart, 314 F.3d 283 (7th Cir. 2002), upon which the Commissioner also relies here, the Seventh Circuit "let stand a hypothetical formulated in terms of 'repetitive, low-stress work,' a description that excluded positions likely to trigger symptoms of the panic disorder that lay at the root of the claimant's moderate limitations on concentration, persistence and pace." O'Connor-Spinner, 627 F.3d at 619. Nothing in the record of this case suggests that plaintiff's problems with CPP are related to stress or panic, and the ALJ did not limit him to low stress work. Finally, the Commissioner cites Simila v. Astrue, 573 F.3d 503, 521-22 (7th Cir. 2009), where the court affirmed an RFC for unskilled work, despite the omission of a CPP limitation from the hypothetical. In that case, however, the ALJ alerted the VE to the claimant's chronic pain and somatoform disorders, which produced the limitations in CPP. In the present case, the ALJ did

39

nothing of the sort. Finally, nothing in the record suggests that the VE independently accounted for plaintiff's limitations in CPP, e.g., by reviewing the record or listening to the testimony. Instead, the ALJ focused the VE on the hypothetical, not the record. O'Connor-Spinner, 627 F.3d at 619. Thus, the matter must be remanded for consideration of plaintiff's limitation in CPP.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 17th day of September, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

40